CHARLES W. HODELL and Others, as Trustees under a Declaration of Trust, etc., and Another, Appellants, *v.* TOWER'S STORES, INCORPORATED, Respondent.

First Department, December 17, 1926.

**Warehousemen — action to recover value of silks stored in defendant's bonded warehouse — goods were stolen by burglars on Saturday afternoon — warehouse is located in New York city, in section infested with criminal gangs — no watchman was on duty — gong burglar alarm inadequate — said facts show negligence — evidence — not error to exclude evidence, on part of defendant, of care that other warehousemen used.**

In an action to recover from the defendant, the owner of a bonded warehouse, the value of silks which were stored in the warehouse and which the defendant was unable to deliver on demand, due to the fact that the warehouse had been burglarized and the silks stolen, the plaintiffs sustained the burden of showing negligence on the part of the defendant, since the evidence shows that the warehouse is on West Twenty-first street, New York city, between Tenth and Eleventh avenues; that that part of the city of New York is infested with criminal gangs; that there was no watchman at the warehouse on Saturday afternoons and Sundays; that the burglary occurred on a Saturday afternoon; that a gong on

the outside of the building was not connected with all the windows and openings in the building and was not connected with the coop in which the silks were stored, nor was it connected with any outside source of protection, and could be rendered useless by cutting the wires.

It was not error for the court to exclude evidence offered on behalf of the defendant, as to the custom of other warehousemen not to employ a watchman on Saturday afternoons and Sundays, for the amount of care required of a warehouseman must depend upon the particular circumstances attending each case.

APPEAL by the plaintiffs, Charles W. Hodell and others, from an order of the Supreme Court, made at the New York Trial Term and entered in the office of the clerk of the county of New York on the 19th day of May, 1924, setting aside a verdict in favor of the plaintiffs and granting a new trial.

*Wolfgang S. Schwabacher* of counsel [*S. I. Sklar* with him on the brief; *Hays, Hershfield & Wolf*, attorneys], for the appellants.

*Oscar Igstaedter* of counsel, for the respondent.

DOWLING, J.   This action was brought to recover damages which plaintiffs claim to have sustained by reason of the defendant's failure to return certain goods which plaintiffs' assignor, the Morcott Company, had stored with the defendant, a public warehouseman.

Plaintiffs were the holders by indorsement and assignment of defendant's warehouse receipts, covering four cases of silks, which were admittedly stored in defendant's public warehouse at 541–545 West Twenty-first street in the borough of Manhattan, city of New York; the issue of the receipts therefor and the receipt of the four cases by defendant are admitted, and it is also admitted that the cases never were returned by defendant to plaintiffs, though demand therefor was made.   Upon these facts, establishing a *prima facie* case, plaintiffs rested.

Defendant's explanation of its failure to return the property was that a burglary had been committed upon its premises, in the course of which the plaintiffs' property, with that of others, had been stolen.

The plaintiffs' reply to this was that the loss of the goods by burglary was due to the defendant's negligence, contributing to the commission of the burglary.

The learned trial court instructed the jury that there were two issues to be determined by them: *First,* " Was there a burglary at which these four cases of goods were stolen, and has the defendant satisfied you that there was a burglary? " and *second,* " Are you satisfied that it was the negligence of the warehouseman that contributed to the burglary? "

The charge was so satisfactory, fair and full that no exception

was taken to it by defendant's counsel, and he made only one request to charge, which was granted by the trial court. This was as follows: " I ask your Honor to charge, that if after considering all the facts, there is doubt in the minds of the jury whether or not the defendant was negligent, after they are convinced there was a burglary, that that doubt shall be resolved in favor of the defendant. The Court: I so charge. In other words, if you are satisfied that there was a burglary, and that defendant has satisfied you to a reasonable degree of certainty there was a burglary, then the burden is upon the plaintiff to prove negligence and he must do that by a fair preponderance of the evidence."

The jury had already been charged as follows: " But if the defendant then comes forward and proves that there was a theft and that these particular goods were stolen, then the plaintiff has the burden of going forth and showing that the defendant was negligent. The defendant has not the burden of going forth and showing that he was free from negligence, but the plaintiff has the burden of proving that under such circumstances the defendant was negligent."

There was practically only one conclusion that the jury could reach on the issue of the burglary, and that was that plaintiffs' goods had been stolen in the course of the burglary committed on defendant's warehouse on May 8, 1920. The real issue they were to determine was whether defendant was guilty of negligence in the conduct of its warehouse, contributing to the successful carrying out of the burglary in which plaintiffs' goods were stolen.

The jury returned a verdict in favor of plaintiffs for the sum of $10,677.50, with interest amounting to $2,381.08, making a total recovery of $13,058.58. This verdict was subsequently set aside and a new trial granted by the learned trial court upon the ground that the defendant's negligence had not been established. In this we think he was in error.

The following facts are established by the evidence: The defendant's warehouse was located at 541–545 West Twenty-first street, between Tenth and Eleventh avenues, in a district which defendant's witness, Police Officer Westervelt, described as " a pretty bad place," with quite a few gangs operating in it whom he described as " lush workers." Some of these gangs had their headquarters at a saloon at the northeast corner of Twenty-fourth street and Thirteenth avenue, kept by one Matty Dunn, otherwise known as " Matty the Rat," which was a rendezvous for thieves and a " hang-out " for the crowds operating in the district, known as " Tanner Smith's," " Hudson Dusters," " Red Lion Inn Mob,"

and " Owney Madden's." In this territory was defendant's warehouse, a United States bonded warehouse, comprising two buildings, one eight stories high, the other seven, with lower buildings on each side of it, one four stories high, the other two. There was a United States government officer, a storekeeper, stationed there, and the government had its own locks on the warehouse, to which its officer held the keys, so that the buildings could not be opened or closed without the presence and co-operation of both the government official and defendant's representative using their separate keys on the different locks. But concededly there was neither a watchman of defendant nor a government official on duty at or present in the warehouse from about one P. M. on Saturday, when both these persons locked the doors and left, until the time the watchman went on duty, which was at five P. M.

The defendant's principal witness, its superintendent, Arthur W. Wadlen, testified that defendant had a watchman on the premises named Moriarty, but on cross-examination he admitted it was no part of the watchman's duty to be on duty Saturday afternoon until five o'clock. There is no proof by defendant as to when its watchman left his post, but defendant's counsel concedes in his brief that no watchman was employed by defendant in the daytime. Apparently the warehouse was also unguarded all day Sunday until five P. M. when the watchman again went on duty. Then on Monday morning the doors were again unlocked by the government storekeeper and defendant's representative, and they entered the premises. Thus the warehouse was customarily left alone, unguarded and without any person whatever in charge, possession, occupancy or supervision of the same from one P. M. to five P. M. on Saturdays, and from some unnamed time on Sunday morning until five P. M. of that day. After five P. M. it was guarded solely by the night watchman. This robbery occurred after one P. M. and before five P. M. on Saturday May 8, 1920, when there was no person whatever guarding the warehouse.

The mechanical devices used to give warning of an attempted forcible entry of these premises seem to me entirely inadequate. Defendant had installed a system known as the " Peerless," which was supposed to connect with " all doors and accessible windows, and opening or cutting the wire will cause this alarm to ring." The alarm consisted of an outside ten-inch gong or bell placed on the third floor of the building, in a protected metal box. There was no device in use by which an alarm would be sent to a point outside the building or the neighborhood, carrying the message that an unlawful entry was being attempted. Defendant's witness Wadlen conceded that if any one succeeded in cutting the wire

leading to the gong, the whole system was " done for." On his direct examination, in response to question by the court, Wadlen testified: " Q. With respect to this burglar alarm, are all the doors and windows attached to that burglar alarm system? A. Most all. Q. Are all the doors? A. Yes. Q. The front door? A. Yes. Q. Is the door of the coop attached to it? A. No, sir." This " coop," in which plaintiffs' silks were stored, was, Wadlen says, " in a very tidy shape when I left it, May 8th; I had men working in there up until 12 o'clock noon; this coop is boarded for about four feet up with big boards, of about 6x2, and above that it is 2x4 inches, and it is screen wire, of very heavy mesh, and there is a good sized door on it to allow the men to go in and out of it with a hand truck; it was padlocked; when these men left that coop, the place was tiered very fine and there was about sixty cases in it; I personally locked the lock and left them out just about 12 o'clock." And yet, as he admitted again on cross-examination, this " coop " containing valuable goods, was not wired, that is, it was not connected with the gong, so that burglars, once in the building, could operate in the coop as long as they pleased without fear of interference.

There is no doubt that the warehouse was burglarized, and apparently about three o'clock, for Officer Westervelt received a telephone message at the Eighteenth precinct detective division from an unidentified " old man," who said, " Westervelt, shoot them over, a load has gone away and a second load is on its way out." Westervelt arrived at the warehouse in time to catch two men named Spencer and Shannon, Spencer putting goods on the truck, and Shannon being inside the warehouse. On Spencer's cry, " Duck, the bulls are coming," both men tried to escape, but Spencer was shot down and Shannon arrested in a garage on the same street, where he had sought to hide. Spencer told the officer that " a mob before had gotten into the warehouse " and " we thought we would take a chance and grab some more of the stuff." He said he had got the truck at " Matty the Rat's place," before referred to. The officer testified that the burglar alarm wire was cut at about the third floor.

The time at which the burglary occurred is fixed at about three o'clock in the afternoon by the testimony of defendant's witness Murphy, a truckman in business at 529 West Twenty-first street. His testimony also is significant as to the character of the neighborhood in which defendant allowed its warehouse to remain unguarded and without personal protection of any kind. He says that he was in the rear of his stable working, when he heard the children in the street say, " The warehouse is getting robbed."

He ran out the front door and saw a car leaving the sidewalk with six or eight cases in it. He then calmly went back into his stable and as he naively says: " I was busy and in about 20 or 25 minutes after — I never went down to look at the doors or anything else, I wasn't that nosey — but in about 20 or 25 minutes I heard shots; then I did get nosey and went to the front again, and I saw the detectives running up the street; well, it was time to go back then because I thought they might be shooting the other way; so I went back in the stable again, and I stayed there. That is all I know about it." This witness says he did not hear the outside bell or gong on the warehouse ring.

It seems to me that in a neighborhood such as that shown by the testimony, with a so-called " system " of protection not connected with all the windows and not connected with the " coop " where valuable merchandise was kept, with no means of communicating an alarm to another point by means of wire, and with no watchman or other representative present on Saturday afternoon and the daytime on Sunday, defendant was negligent, and that the mere presence of an outside gong on the third floor, inclosed in a metal box at the mercy of the cutting of a wire, which instantly rendered it valueless and destroyed the sole means of communicating an alarm to the outside world, was no discharge of defendant's duty to be reasonably careful and prudent in guarding a warehouse containing valuable goods belonging to its customers. The conditions existing here were an open bid for the commission of burglary by the criminally inclined, and defendant's negligence contributed to the theft which actually occurred and by reason of which plaintiffs were damaged.

Defendant complains that evidence was excluded of the custom of other warehousemen not to employ a watchman in the daytime on Saturday afternoon or Sundays. I believe this evidence was properly excluded. The amount of care required of a warehouseman must depend upon the particular circumstances of each case. As Chamberlayne says in his work on Evidence (§ 3152): " Thus, in a negligence action, no inference that a certain act was reasonable or that a certain person acted in a reasonably careful manner can be drawn from the fact that others in the same business have or have not done such act or are or are not in the habit of acting in such a manner."

In *Wabash Railway Company* v. *McDaniels* (107 U. S. 454) the court says: " These observations meet, in part, the suggestion made by counsel, that ordinary care in the employment and retention of railroad employés means only that degree of diligence which is

37

customary, or is sanctioned by the general practice and usage, which obtains among those intrusted with the management and control of railroad property and railroad employés. To this view we cannot give our assent."

In *Schwerin* v. *McKie* (51 N. Y. 180) there was a request to charge as follows: " That if the storehouse in question was secured in all respects, and watched as well as stores of this description usually are, notwithstanding the goods were stolen from the store by persons other than the defendants or their agents or servants, the defendants are not liable." This request was denied. On appeal, this denial was sustained, the court saying (p. 187): " Whether the storehouse in question was, in all respects, secured and watched as well as stores of the same description usually were, or whether they were as strongly secured in the respects mentioned as similar warehouses in Brooklyn, Jersey City and Hoboken, did not establish the fact that goods in them were housed and protected as a man of ordinary prudence would, under the circumstances, have protected his own property."

The order appealed from should, therefore, be reversed, with costs and disbursements, and the verdict of the jury reinstated.

Clarke, P. J., Merrell, McAvoy and Burr, JJ., concur.

Order reversed, with costs and disbursements, the verdict reinstated and judgment directed to be entered thereon, with costs.