**Esther BARAD, Plaintiff-Respondent,**

v.

**LEPPERT ROOS FUR COMPANY, a corporation, and Sloan's Storage Company, Defendants,**

**Leppert Roos Fur Company, a corporation, Defendant-Appellant.**

**No. 33148.**

St. Louis Court of Appeals.

Missouri.

May 20, 1969.

Motion for Rehearing or for Transfer to the Supreme Court Denied June 13, 1969.

Application to Transfer Denied July 14.

Willson, Cunningham & McClellan, St. Louis, for defendant-appellant.

Hoffman & Shostak, Burton H. Shostak, Theodore Hoffman, St. Louis, for plaintiff-respondent.

BRADY, Judge.

Plaintiff sued defendant, a furrier with whom she had stored a fur coat, for negligence. Jury verdict and judgment for plaintiff was for the sum of $4,500.00, the agreed fair market value of the coat.

The petition alleged plaintiff stored her coat with defendant and demanded its return "but because of the negligence and carelessness of defendants in the storage and keeping of fur coats, said fur coat has not been returned. * * * Defendants have superior knowledge or means of information as to the exact cause of why said fur coat has not been returned." The answer alleged the coat was stolen by burglars from defendant's storage vault, an act for which defendant was in no way responsible.

While there are other allegations of prejudicial error the determinative issue as we view this appeal is whether the trial court correctly overruled defendant's motion for directed verdict based on the defendant's contention plaintiff had failed to make a submissible case as defendant owed no duty to take more extensive precautions to avoid burglaries than those taken. The facts stated will be limited to those bearing upon this issue.

There is no dispute as to the facts. The only testimony offered was that given on behalf of plaintiff. While plaintiff pled general negligence she offered evidence as to the specific details involved. This evidence shows plaintiff was the owner of a full length ranch mink fur coat which she purchased some four months prior to sending it to defendant for storage in June of 1966. When she delivered it to defendant for storage there was no discussion as to where the coat was to be stored. Plaintiff heard about a burglary that had occurred at defendant's storage place during the Labor Day weekend of 1966 so she went to defendant and requested her coat, but it was one of those taken in the burglary and was never recovered. Defendant's treasurer testified it was in the business of storing fur garments for customers and others and their regular storage charge for a coat such as plaintiff's, where the owner has her own insurance, was $10.00. Defendant would sell insurance to the owner if he or she wanted it. While the fur storage rooms were referred to as "vaults" by defendant, they were merely rooms where furs were stored and were of the same type as those in the rest of the building in which defendant rented space.

The two rooms defendant used to store furs were on the 6th floor of a 7-story warehouse building. The building was equipped with a passenger and a freight elevator. The latter required a key to operate. In addition to defendant and a tenant who rented the basement, the balance of this building was used by Sloan's Moving & Storage Company to store furniture and records. Defendant rented one room from Sloan's on a yearly basis and during the busy season rented a second room on the same floor. Sloan's had no agreement to provide security services of any type for defendant and had a minimum of two employees at this building between 7:00 A. M. and 5:00 P.M. on workdays. Sloan's had no outside watchman and neither did defendant. The last employee on the premises was to lock up under supervision of one of Sloan's officers or supervisors. The doors by which one gained entrance to the building were not protected by burglar alarm systems. There is a stair running up the seven stories of the building. This stair has a double fire door at each floor level and these are kept locked. On the occasion of this burglary the front door locks were found to have been tampered with and some were broken. In addition, there were "jimmy marks" on the ground floor outside doors.

Defendant's main storage room was in the southwest corner of the 6th floor. The

additional room was next to it. The ceiling in these two rooms was poured concrete as was the floor and the two outside walls. The inside walls were standard 8-inch thick building tile surfaced with plaster. The only special equipment in the rooms was the burglar alarm system and the racks and bars upon which coats were hung. On Labor Day weekend in 1966 defendant had between four and six thousand fur garments stored in these two rooms. The testimony was that a $750.00 value per garment would be a "very high average".

Defendant had a burglar alarm system on the doors leading to each of the fur storage rooms. If anyone opened or went through the door an alarm would be set off in the office of the American District Telegraph Company and relayed to the Police Department within about ten seconds. There was no x-ray, radio frequency waves or anything of that nature to set off an alarm by disturbance in the areaway of the room. There was no alarm to sound if someone broke through the ceiling, floor or wall of either of the rooms. Only if the doors to the rooms were entered did the alarm sound. On the occasion of this burglary both storage rooms had been broken into by knocking holes three or four feet in diameter through the building tile forming the interior walls of the rooms. Whatever means were used were those employing great force as the building material was cracked as far as thirty to forty feet away from the holes.

At the time of trial the witness Benedict had been with the American District Telegraph Company some five years selling and servicing burglar alarm and detection systems for businesses and homes. He testified there are basically four methods of safeguarding a building or room, but all four systems would not be installed in any single premises. The most appropriate system for a business considering the condition to be protected is the type chosen. In so determining, they take into account the nature of the building and the kind of business. However, the customer could dictate to them what he desires. ADT makes the determination. One system consists of wiring the door into an area. It is a magnetic contact on the door and is the simplest and easiest to install. The door is completely wired and if a door is forced, broken or opened, the alarm is set off.

A second system can be installed to protect the walls of the room against break-in if the wall is "some metallic concrete—steel concrete reinforced". This system is called Teletype. Vibration as well as sound sets this system off, and if someone broke a hole in the wall the alarm would be set off. On a wall twenty to thirty feet long (the approximate length here involved) a number of devices would be used to cover the length of the wall. The alarm would be transmitted to ADT and the police in the same way as the first system. A third system is an ultrasonic sound system using ultra high frequency waves so that any movement inside a protected room would cause the alarm to go off. The fourth system uses a floor beam from an invisible electric cell built into the floor. A centering receiver has a light that completes an electric circuit, and any intervention into this area will break the circuit and set off the alarm. This system operates basically the same as an electric eye, and a number of such cells can be set up on a floor in such a manner that anyone walking in the room would set off the alarm. This system is primarily installed to trap someone in the building. If you had just two walls to get into a room you could put one on each wall so anyone coming into the room would be likely to break one of them. The system which protects the walls has been in existence and for sale about a year, and the other systems for more than five years. These same systems can be used to protect entry through a ceiling or floor. The normal time for police response to an alarm is two to three minutes. The person setting off the alarm doesn't hear it, the theory being there would be great likelihood he would be apprehended.

The witness Benedict further testified the principal purpose and theory of installing the protective devices is to cover openings into a room such as doors and windows, and the only openings that entered into the rooms used by defendant in this building were wired by his Company's alarm system. The wall type protective system described above could only be installed if the wall was built of concrete reinforced with steel members in it, and since this building did not have steel in the walls of these rooms but was constructed of 8" building tile you could not install that type of alarm system. The ultrasonic system described above has some reservations, including draft conditions or movement or sound preventing stocks of merchandise such as raw materials, carpeting, clothing, etc. Benedict did not check the feasibility of this system for defendant, nor the feasibility of the radio frequency system, both of which were in existence at the time. Furs would be a type of material that might interfere wtih this type of system to the extent that their engineering department has to approve sound systems in fur stock rooms. It may or may not work in a given case. The witness Benedict further testified professional burglars who know their business can jump all of these alarm systems, although it is not too easy for them to do so.

Donald Brown testified that he is a sergeant in the St. Louis Police Department working as supervisor of the Crime Analysis Unit which assembles and accumulates crime statistics for the purpose of deploying tactical units into business, high crime, or troubled areas. His unit receives information from each of the nine districts as to crime occurrences during the past twenty-four hours, and such information is pinned on a map and accumulated over four day periods. Based on such crime pattern the tactical units are assigned. The witness further testified that on the map they pinpoint all facts as to the crime, stressing auto, theft, business burglary and residence burglary; that there are nine police districts and 5619 Delmar is in the Seventh Police District; that in their analysis they rate the districts against each other as to the frequency of crime in the districts and thereby determine which district has the highest frequency of crime; that such records are official police records which are available to members of the Police Department and to the public; that during the year 1965 and up to Labor Day weekend of 1966 the Seventh Police District led in total crime sixteen months out of said twenty month period, showing the frequency of crime in that district was higher than in the other districts; that the Seventh District was either the first, second or third in every month during said period; that he was not overly familiar with the position of the Seventh District in 1963–64, but believed that the Seventh District was pretty high in those years too; and that the information has been made available to newspapers and is published in an annual report in addition to an annual press release.

Plaintiff's verdict directing instruction read: *"INSTRUCTION NO. 2* Your verdict must be for plaintiff if you believe: First, defendant failed to provide adequate safeguards for the storing of plaintiff's coat, and Second, defendant was thereby negligent, and Third, such negligence directly contributed to cause damage to plaintiff."

Digressing for the moment, we feel compelled to note the quality of the briefs submitted in this appeal with regard to the extent of research as to case law, clarity of thought and expression, organization and presentation, and forcefulness of thought-provoking content, is of the highest professional standard. We have too often criticized members of the bar for deficiency in that regard to refrain from commendation when it is due able counsel.

In Gutknecht v. Wagner Bros. Moving & Storage Co., Mo.App., 266 S.W.2d 19, this court held that where plaintiff elects to sue upon a theory of negligence rather than standing upon the bailment contract

plaintiff has the burden of establishing that negligence. In attempting to bear that burden plaintiff contends a submissible case of negligence was made by evidence defendant's warehouse was in a high crime district, that garments of a great total value were stored therein, and that only the doors to the rooms used by defendant as storage were protected by burglar alarms. Plaintiff relies upon a rule stated in 93 C.J. S. Warehousemen & Safe Depositaries § 45, p. 469, to the effect defendant was required to exercise ordinary or reasonable care to protect the goods in its custody against theft and that such care will be measured by the circumstances involved such as the character and value of the goods in storage and the character of the neighborhood in which the warehouse is located. A reference to that work will show the statement relied upon by plaintiff is based upon the decisions in Hodell v. Towers Stores, 218 App.Div. 572, 218 N.Y. S. 561 and England v. Lyon Fireproof Storage Co., 94 Cal.App. 562, 271 P. 532. A brief résumé of the facts of each case and the ruling of the court will serve to illustrate the inapplicability of the statement relied upon to the issue in the instant appeal.

In Hodell plaintiff proved delivery of merchandise to defendant for storage and that defendant failed to return these items on demand. Defendant met this proof by proving a burglar had stolen the merchandise. Plaintiff then proceeded to prove that the building was in the same block as a known hangout of a gang of criminals; that at certain times there was no watchman at the building and no burglar alarm except a device which rang a gong inside a box on the 3rd floor of the building. Moreover, plaintiff's goods were stored in a small room which was partly constructed of open wire mesh, and was referred to as a "coop". It was shown this room was not connected to any burglar alarm system. The Court held that this evidence was sufficient to sustain a verdict for the plaintiff as to defendant's negligence.

In England plaintiff sued for the loss of household goods stored with defendant, including seven cases of liquor. Plaintiff proved defendant had suffered other theft losses of liquor from within its warehouse, and defendant had been warned that one of its employees was a bootlegger which so aroused defendant's suspicions it hired a detective to spy on its employee but did not fire him. Plaintiff's goods were stored in a separate room, yet the defendant furnished a key to such room to several of its employees in spite of the fact that they had no occasion to go into such room. It was further shown that defendant's practice was to throw master keys into the trash when they became a little worn. The Court held that this evidence was sufficient to sustain a verdict for the plaintiff. The inference drawn from the evidence in that case was that defendant's own employees had stolen plaintiff's liquor. The distinctions between Hodell and England on one hand and the instant appeal on the other are obvious and glaring. In Hodell there was a known gang of criminals, no alarm worthy of the name, and storage was in an open wire coop. In England defendant had notice of and was in fact suspicious of the activities of one of its employees yet so acted that keys were readily available to anyone who might be given one or pick up one out of the trash. Contrasting such circumstances with those in the instant appeal where the coat was stored in a room having concrete ceiling, floor and two walls (the other two being building tile 8″ thick); where there was in fact an alarm; where the doors were kept locked; and where entrance was gained by the unusual manner shown in the evidence, Hodell and England do not rule the instant appeal.

Plaintiff also relies upon its statement four different types of burglar alarms were available implying defendant was negligent in not installing a type different from that it had. The evidence does not support the drawing of such an inference. While it was shown that there are four known

types of burglar alarms, plaintiff did not establish that it was feasible to have used any of them in rooms filled with furs hanging on racks. In fact, it was shown that one of these systems could not be installed unless the walls of the room were constructed of reinforced steel members and thus unavailable to defendant. The ultra-sonic system was shown to require conditions which would prevent its being used by defendant such as the absence of furs or other materials which muffle sound. The fourth system was described as an electric eye type of device primarily useful in a single spot as a sort of trap. Plaintiff's witness who described the various burglar alarm systems was unable to say whether any of these systems could have been used in defendant's rooms under the particular conditions that prevailed there. The result is there is no substantial evidence any other burglar alarm system could have been used by the defendant in the premises in question. In addition, plaintiff's witness admitted that professional burglars could "jump" or bypass all of these burglar alarm systems.

While there is a paucity of decisions in this state ruling upon factual situations closely similar to that presented by the instant appeal, there are decisions from other jurisdictions which we think help light our way. Among these is Batelle et al. v. Mercantile Warehouse Co., 139 App. Div. 649, 124 N.Y.S. 135, involving an action to recover the value of goods stolen by burglars from a warehouse. The petition pleaded as negligence defendant's failure to employ a watchman, to maintain a burglar alarm system, and to properly secure the warehouse against forceable entry. The court held there was no evidence there existed a custom in the past for a warehouseman to have a night watchman or burglar alarms. The court also noted this burglary was accomplished by a burglar who climbed from the roof of a flat next door to the top of the warehouse and broke into an elevator shaft which was covered with tin, stating it seemed to the court defendant was not called upon to anticipate burglars

would gain entrance to their building in that manner. In Kansas City, Ft. S. & M. Railway Company v. Patten, 3 Kan.App. 338, 45 P. 108, a passenger on a train delivered baggage to a railroad which was to carry it to its destination and deliver it back to the passenger. At the destination it was put in the baggage room and stolen therefrom by a burglar. The court held it was not necessary the baggage room be burglar proof but was sufficient if the room be reasonably safe with all openings well secured with good bolts or locks. In Hutchinson v. United States Express Co., 63 W.Va. 128, 59 S.E. 949, 14 L.R.A.,N.S., 393, plaintiff brought suit for the value of a package of furs stolen from the express company. The furs were burglarized from the express company's freight office at the railway station. The court held a warehouseman was not liable, stating at 1. c. 953: "Effort is made to hold the company liable on the ground of the character of the place of deposit. * * * It was entered by breaking a window and prying the hinges of an inner door loose. The package was left in the freight room. No law requires the maintenance of a burglar proof building, and it must be obvious that the ordinary railway station constructed of wood, brick, or stone, and having glass windows unprotected by iron shutters, as practically all such buildings have, may be easily entered by any one who wills to do so. The protection upon which the citizen relies for the safety of his property is not so much in the burglar proof character of buildings and other places of deposit, as the honesty of the masses of the people, and the wholesome fear which the comparatively few criminals have of the penalties of criminal law. This building was not left open nor unlocked, and the entry was made with force and violence. There is nothing in the evidence relating to its character or condition which would have warranted a jury in finding a verdict against the defendant on the ground of failure to deposit the goods in a safe place." There are other cases of similar nature in other jurisdictions but these will suffice as illustrations of

**110**

what we feel to be compelling legal reasoning.

 In Gutknecht v. Wagner Bros. Moving & Storage Co., supra, we quoted with approval from Kelley v. National Lead Co., 240 Mo.App. 47, 210 S.W.2d 728, 1. c. 734: "* * * in order to impose liability there must not only be a lack of care, but such lack of care must involve a breach of some duty owed to another under the particular circumstances existing at the time of the act or omission complained of, which act or omission must have proximately resulted in such other person's injury." In Gutknecht the issue involved plaintiff's contention failure on the part of defendant to have metal doors, a sprinkler system, a watchman, and other similar precautions to avoid fires constituted negligence. Therein we stated: "It is common knowledge that fires do occur and property is destroyed where the buildings burned have metal doors, fire extinguishers, watchmen and all the other things alleged to have been lacking here." Paraphrasing that statement, it is common knowledge burglaries do occur and property is stolen where the buildings entered do have burglar alarm systems more extensive than that involved in the instant case, watchmen, and are not in so-called "high crime districts". There is no showing that more extensive precautions to avoid burglary than those employed by defendant in the instant appeal were the custom in defendant's business. There is not even a showing more extensive precautions were the exception and indeed the only reasonable inference from the testimony is they were not as plaintiff's own expert admitted that whatever system was used a professional burglar could nevertheless enter the building without detection. Neither do we believe defendant was under any duty to anticipate burglars might gain entrance to these rooms by blowing or otherwise forcing a 4 or 5 foot hole in the 8" thick construction tile plastered interior walls of these rooms on the 6th floor of this warehouse.

We hold defendant was under no duty to move its warehouse to another section of town, to provide a watchman, or to install a more extensive burglar alarm system than that employed. The judgment is reversed.

WOLFE, Acting P. J., concurs.